# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**

**AMIR ABDOLAZIZ DIANAT A/K/A**
**AMEER ABDULAAZEEZ JAAFAR,**

and

**KAMRAN ALI LAJMIRY A/K/A**
**KAMRAN ALI LAJMIRI**

Case No.: 20-mj-72
Assigned to: Judge G. Michael Harvey
Assign Date: 4/30/2020
Descrtiption: Criminal Complaint w/Arrest Warrant

## <u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT</u>

I, **Special Agent Cindy Burnham,** being duly sworn, depose and state as follows:

### I.     INTRODUCTION AND SUMMARY OF PROBABLE CAUSE

1.      I make this affidavit in support of a criminal complaint charging Amir Abdolaziz DIANAT a/k/a Ameer Abdulaazeez Jaafar ("DIANAT") and Kamran Ali Lajmiry a/k/a Kamran Ali LAJMIRI ("LAJMIRI") pursuant to 18 U.S.C. § 371, with knowingly and willfully conspiring with each other and persons in Iran to use the U.S. financial system to procure a petroleum tanker named Nautic, and later renamed to the Gulf Sky, in violation of the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, issued under the authority of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701-07, as well as conspiring with others to launder funds, through the United States, in violation of 18 U.S.C § 1956(h).  As set forth in greater detail below, there is probable cause to believe that the illegal activity in support of these offenses occurred from in or about April 2019 to the present date.

2.      The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, on documents that I have reviewed, and on my training

and experience.  Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Because this Affidavit is being submitted for a limited purpose, I have not set forth all of the information known to me concerning this investigation.  Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of the government's application for a warrant to seize the Target Funds.

## II.    AGENT BACKGROUND

4.      I am a Special Agent of the United States Federal Bureau of Investigation ("FBI"). I have served in the FBI since 2006.  Since becoming a Special Agent with the FBI, I have participated in investigations of counter proliferation and other national security matters on a counterintelligence squad at the FBI's Minneapolis Field Office. Among other things, I have conducted and participated in physical surveillance, the execution of search warrants, and debriefings of informants.

5.      While working for the FBI, I have been involved in investigating violations of federal law including the illegal export of arms and strategic technology commodities from the United States, among other violations.  I have also been involved in investigations of alleged criminal violations of the Bank Secrecy Act and the Money Laundering Control Act, involving multiple jurisdictions in addition to the United States.  Moreover, I have participated in gathering evidence to obtain search and seizure warrants relating to financial crimes.  I am empowered by law to investigate and make arrests for offenses involving the unlawful export of arms and commodities to destinations outside the United States, as specified in the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R.

Part 120 et seq., IEEPA, and the ITSR.   I am similarly empowered by law to investigate and make arrests for offenses involving the laundering of monetary instruments and conspiracies to launder monetary instruments, as specified in 18 U.S.C. §§ 1956(a), (h).

6.     As a Special Agent with FBI, I am familiar with the federal laws relating to the unlawful export of arms and commodities from the United States as specified and regulated by the Department of State ("DOS"), Directorate of Defense Trade Controls ("DDTC"); Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"); and the Department of the Treasury, Office of Foreign Assets Controls ("OFAC"), all of which are located in Washington, D.C.  I am also familiar with related laws, the interpretation and application of federal laws and federal court procedures, and have previously assisted in the execution of numerous federal search and arrest warrants.  I have participated in numerous investigations of violations of United States laws relating to the unlawful export of arms and commodities restricted for export for reasons of national security, foreign policy, anti-terrorism and embargoed destinations.  As a Special Agent with FBI, I have received considerable training related to identifying the techniques, methods, and procedures employed by groups, organizations, companies, corporations, and individuals to export goods and commodities in violation of United States export laws, as well as laundering into and out of the United States funds related to such transactions.   In addition, I have received specific instruction and training on conducting criminal investigations associated with export law violations, which included investigations associated with violations of the IEEPA.

III.     **JURISDICTION**

7.     This Court has jurisdiction to issue the requested warrant, because, as discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.

IV.     **STATUTORY BACKGROUND OF VIOLATIONS**

A.  50 U.S.C. § 1705

8.      Enacted in 1977, IEEPA gives the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

9.      Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

10.     On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders").  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2012, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

11.     The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibits, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the

Government of Iran (with certain limited exceptions), including the exportation, re-exportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC,which is located in Washington, D.C.

12.     The ITSR also prohibits the supply of services where the benefit of such services is otherwise received in Iran, if such services are performed in the United States or provided outside the United States by a U.S. person.  *See* 31 C.F.R. § 560.410.

13.     The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, re-export, sale, or supply of services to Iran or the Government of Iran.  *See* 31 C.F.R. § 560.427(a).

14.     The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.  31 C.F.R. § 560.203.

15.     On November 5, 2018, the Department of the Treasury designated the National Iranian Oil Company ("NIOC").  A previous press release noted that NIOC was owned by the Government of Iran through the Ministry of Petroleum, and was responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.  It further noted the close relationship between the IRGC and NIOC.

16.     On November 5, 2018, the Department of the Treasury designated National Iranian Tanker Company ("NITC").  A previous press release noted that NITC was a Government of Iran entity which employed various front companies.

17.     On January 23, 2020, the Department of the Treasury described NIOC as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies."

B.  18 U.S.C. § 371

18.     At all times material to the investigation at issue, Section 371 of Title 18, U.S.C., provided, in pertinent part:

19.     If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

C.  18 U.S.C § 1956(h)

20.     18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

21.     18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes, inter alia, transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

22.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes a violation of the IEEPA, and 18 U.S.C. § 1344 (bank fraud).

V.     **FACTS ESTABLISHING PROBABLE CAUSE**

23.      This complaint arises from a scheme to unlawfully access the U.S. financial system to support illicit shipments to and from Iran.  The Iranian parties established front companies that transmitted U.S. dollar wires through the United States to purchase the petroleum tanker Nautic a/k/a Gulf Sky ("Nautic") beginning in or about September 2019.  Shortly after these entities purchased the Nautic, they used the Nautic to transport Iranian crude oil from Kharg Island, Iran in coordination with NIOC.

24.     I am aware that a Greek company ("Greek Company 1") operates a fleet of tankers.

One of these tankers was the Nautic.

25.     Greek Company 1 employed a subsidiary company, Liberian Company 1, to effect this sale.

26.     The managing director of Greek Company 1 confirmed to a news publication that the Nautic was sold to an "Indian" company named Taif Mining Services ("Taif").  Bank records from the U.S. bank which processed the sale of the Nautic to Taif indicate that the U.S. Bank was able to freeze approximately $10 million as part of this transaction for possible sanctions compliance / anti-money laundering reasons.

27.     I am aware that due to the freezing of these funds, Liberian Company 1 did not receive payment for the sale of the Nautic. As such, Liberian Company 1 sought and obtained a civil court order in the United Arab Emirates with which it seized the Nautic.

## COCONSPIRATORS

28.     Public corporate registry information revealed that Taif was created around the time that it purchased the Nautic.

29.     Taif's website displays indications that the company was created on behalf of third party companies for the purpose of conducting this transaction.  For example, the Taif website indicates that Taif is actually located at a P.O. Box in Oman, not India, and that the company is cooperating with an Indian shipping company ("Indian Company 1"). Public records revealed that Indian Company 1 is listed as the manager of the Nautic.

30.     Registration information from Taif's website shows that the contact information for Taif was redacted using a privacy service, indicating an intent to hide the ultimate beneficial owner of the company.

31.     Business records from the company that registered Taif's domain show that the website was created on August 24, 2019 by an employee of another Indian shipping company

("Indian Company 2").  This date closely aligns to when Taif purchased the Nautic.  A corporate registry database revealed business records showing Indian Company 2 has a common director with Indian Company 1, leading me to conclude that these are all affiliated companies set up to obfuscate the beneficial owner, consistent with money laundering practices.

32.     Open source information indicates that an Iranian company ("Iranian Company 1"), is located at the same P.O. Box in Oman as Taif. Search warrant returns revealed that Iranian Company 1 was involved with the purchase of the Nautic.  For example, on or about July 30, 2019, Iranian Company 1 communicated with Taif about better coordinating future mining and natural resource exploration activities with Iranian officials.  A cached version of Iranian Company 1's website lists that it attends mining exhibits in both Oman and Iran, which appears consistent with Taif's Iranian line of business.

33.     Another company in Iran ("Iranian Company 2") is a corporate entity that lists the same P.O. Box in Oman as Taif and Iranian Company 1. I believe that Iranian Company 2 was behind the purchase of the Nautic.

34.     Search warrant returns for co-conspirators' email accounts revealed that email accounts associated with Taif, Iranian Company 1, Iranian Company 2, and an Iranian ship management company ("Iranian Company 3") all communicated with Brokerage Company 1 near the time of the sale of the Nautic, which was transacted in U.S. dollars.

35.     Iranian Company 3 advertises that they have decades of business experience with the National Iranian Tanker Company ("NITC").  Iranian Company 3 also claimed to do business with the Iranian Offshore Oil Company ("IOOC"), which is a subsidiary of the National Iranian Oil Company ("NIOC"), according to publicly available information.

36.     The scheme was primarily orchestrated by DIANAT and LAJMIRI:

a.  Search warrant returns have shown that DIANAT was an Iranian national residing in Iran and Oman. DIANAT was the managing director of a company incorporated in Iran.  Search warrant returns for an email account used by a co-conspirator revealed that DIANAT has acted as the regional director of Iranian Company 2. DIANAT uses both an Iranian passport in his name and an Iraqi passport under the alias of "Ameer Abdulaazeez Jaafar."

b.  Search warrant returns have shown that LAJMIRI was an Iranian national who was employed by Iranian Company 3.  LAJMIRI acted as a procurement agent on behalf of DIANAT and other entities in Iran to procure the Nautic from Liberian Company 1.

37.  LAJMIRI and DIANAT both have experience doing business with NIOC and NITC.

a.  Search warrant returns revealed that on or about May 20, 2016, the NIOC Deputy Minister and International Marketing Managing Director sent DIANAT a letter of intent to transport Iranian crude oil to the United Arab Emirates.  Additionally, DIANAT previously coordinated with NIOC to load Iranian crude oil at Kharg Island.

b.  LAJMIRI's visa application contained employment history, which revealed that he was employed for approximately seven years by NITC in Kharg Island, Iran. LAJMIRI also previously used NIOC as a bunker supplier at Kharg Island. According to the Iranian Company 3 website, LAJMIRI has "decades of experience" working with "huge companies as NITC and IOOC [Iranian Offshore Oil Company]."

38.     Search warrant returns for co-conspirator email accounts revealed that LAJMIRI lamented that "buying even the smallest and most ordinary items, even simple industrial components, has become a major challenge for Iranian traders and traders because of [] US sanctions."  LAJMIRI further noted that it is "is almost impossible under these circumstances" to purchase tankers.

**Taif was an Iranian Front Company Used to Purchase the Nautic**

39.     Search warrant returns revealed that in 2019, DIANAT retained LAJMIRI as a consultant to assist with purchasing, inspection, and oversight of vessels.

40.     In 2019, DIANAT and LAJMIRI agreed to purchase the Nautic from Liberian Company 1.  LAJMIRI retained an agent in Japan ("Japanese Agent") to assist in this purchase.

41.     LAJMIRI initially planned to use Iranian Company 2 as the buyer of the Nautic. However, on or about April 30, 2019, Japanese Agent informed LAJMIRI that the bank processing the sale of the Nautic would need detailed background documentation on Iranian Company 2 and affiliated entities as part of "OFAC" and due diligence checks by the bank.

42.     On or about that same time, LAJMIRI and DIANAT caused the registration of Taif.

43.     Taif was nominally registered in the name of two Omani nationals, however, search warrant returns contained corporate documents, which revealed that DIANAT and another Iranian individual maintained the true majority ownership of Taif.

44.     On or about May 29, 2019, LAJMIRI inserted Taif as the new buyer of the Nautic, in lieu of Iranian Company 2.  The United Kingdom broker to the transaction required that Taif produce a performance guarantee on Iranian Company 2 letterhead stating that Iranian Company 2 "unconditionally and irrevocably guarantee[s]" Taif's purchase of the Nautic from Liberian Company 1.

45.    Search warrant returns for co-conspirator email accounts revealed that LAJMIRI described Taif as having "no experience, no background in such major projects" such as the purchase of a vessel.

46.    Search warrant returns for co-conspirator email accounts further revealed that LAJMIRI admitted that it was "very difficult" to get Liberian Company 1 to sell a ship to a company with no background. LAJMIRI further stated that with help from Japanese Agent who had international credentials, LAJMIRI was able to convince Liberian Company 1 to sell to Taif.

47.    LAJMIRI further admitted in this correspondence that he had to circumvent sanctions in order to purchase the Nautic.

48.    On June 10, 2019, a Taif nominee owner signed a memorandum of agreement for the purchase of the Nautic and warranted the buyers, "including, but not limited to, the Buyers, shareholders and/or affiliated companies," were not under any "sanctions, prohibition or blacklist whatsoever imposed by USA, UK, EU, UN."

49.    On or about September 10, 2019, Taif wired $2,340,000.00 through a brokerage firm in the United Kingdom ("UK Brokerage Firm") as a 20% deposit for the Nautic, which funds were then transferred to Liberian Company 1 and transited through the United States.

50.    Between on or about October 8 and 16, 2019, Taif wired the balance of the purchase price to UK Brokerage Firm.

51.    On or about October 23, 2019, Taif caused the UK Brokerage Firm to wire $9,983,931.91 with the instruction of "Payment of Balance" to Liberian Company 1.

52.    On or about October 24, 2019, Taif caused the UK Brokerage Firm wired the remaining $15,010.00 with a note of "Additional Fee Due to Delay."

53.    Shortly thereafter, the wired funds were frozen while transiting through a correspondent account at U.S. Bank 1.

54.     Liberian Company 1 transferred possession of petroleum tanker Nautic to Taif. Taif subsequently renamed the Nautic to the Gulf Sky.

55.     OFAC indicated that Taif failed to seek or obtain an OFAC license for the above transactions.

**Nautic Received Iranian Crude Oil from NIOC After Purchased by Taif**

56.     Search warrant returns for co-conspirator email accounts revealed that on December 2, 2019, after taking possession of the Nautic, Taif ordered the captain of the Nautic to take the vessel to Iran.

57.     These search warrant returns further revealed that on December 2, 2019, Taif notified two Iranian Company 2 employees that Taif had sent the vessel to Iran.

58.     These search warrant returns also revealed that on December 3, 2019, the captain of the Nautic notified Taif that a notice of readiness had been tendered to NIOC at Kharg Island, Iran for loading.

59.     These search warrant returns also revealed that after receiving this document, Taif notified two Iranian Company 2 employees that the Nautic loaded Iranian crude oil onboard.

60.      Subsequent to this voyage, the Nautic was seized pursuant to a U.A.E. civil court order.

## CONCLUSION

61.     Based on facts described above, there is probable cause to believe that DIANAT,

LAJMIRI, and their co-conspirators, violated the IEEPA by causing the export of financial services

for the benefit of entities in Iran, including NIOC and NITC, without the applicable OFAC

licenses.  DIANAT and LAJMIRI also conspired with others to launder funds in violation of 18

U.S.C § 1956(h).

Respectfully submitted,

Cindy R Burnham
Cindy Burnham
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 1st day of May,
2020.

2020.05.01
09:04:57 -04'00'

HON. G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

13