**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ESTATE OF JEREMY ISADORE LEVIN,**
*et al.*,

     **Plaintiffs,**

       v.

**WELLS FARGO BANK, N.A.,**

     **Defendant.**

**(And consolidated cases)**

**Civil Action No. 21-420 (JEB)**

---

<u>**MEMORANDUM OPINION**</u>

     Congress has established a generous compensation scheme for victims of terrorism and their families. The United States Victims of State Sponsored Terrorism Fund doles out money pursuant to an evenhanded and orderly process for all claimants. Having learned that Wells Fargo Bank held $10 million in funds that the Office of Foreign Assets Control initially blocked in connection with an Iranian front company's attempted purchase of a petroleum tanker, Plaintiffs here seek to jump the queue and obtain a quicker payday by attaching such assets. The Government, conversely, endeavors to recover the money through a separate forfeiture action so that it can deposit those funds into the Victims Fund and thereby maintain its equitable process for compensating all U.S. claimants.

     In these consolidated actions, the Court must determine whether Plaintiffs or the Government may properly claim the funds. Upon remand from the D.C. Circuit, the United States renews its Motion to Quash Plaintiffs' attachments but presses alternative grounds. Because this Court finds those grounds persuasive, it will grant the Government's Motion.

1

Plaintiffs must remain in line and wait their turn.

## I.     Background

As the complicated factual and procedural background of this case has been previously covered by both this Court and the D.C. Circuit, a brief background on issues most relevant to this latest Motion will suffice.  See Levin v. Islamic Republic of Iran, 523 F. Supp. 3d 14 (D.D.C. 2021); Estate of Levin v. Wells Fargo Bank, N.A., 45 F.4th 416 (D.C. Cir. 2022).

### A.  Factual Background

The Court begins by reintroducing the two groups of Plaintiffs in this case and then offers a brief history of the origin of the funds at issue here.

#### 1.     Plaintiffs' Judgments

Plaintiffs in the cases addressed in this Opinion are two groups of individuals with unsatisfied judgments against Iran.  First, those in Levin have some relation to Jeremy Levin, who was kidnapped and tortured in 1984 by the Iran-backed terrorist group Hezbollah.  See Levin v. Islamic Republic of Iran, No. 05-2494, ECF No. 23 (Levin Report and Recommendation) (D.D.C. Dec. 31, 2007).  Although these Plaintiffs have collected a portion of their judgment amounts, they are still owed over $15 million including post-judgment interest. Id., ECF No. 34-2 (Levin Mot. for Writ of Attachment) at 4.

Second, Plaintiffs in Nos. 21-126, 21-127, and 21-128 (Owens Plaintiffs) are all individuals who bear some relation to victims of al Qaeda's 1998 suicide bombings of U.S. embassies in Kenya and Tanzania.  In 2011, Judge John D. Bates of this district found Iran liable for those attacks because it had "provided material aid and support to al Qaeda."  Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 135 (D.D.C. 2011).  He eventually entered judgments against Iran totaling nearly $1 billion.  See Owens v. Republic of Sudan, No. 01-2244, ECF No.

301 (Judgment) (D.D.C. Mar. 28, 2014); <u>Mwila v. Islamic Republic of Iran</u>, 33 F. Supp. 3d 36

(D.D.C. 2014); <u>Khaliq v. Republic of Sudan</u>, 33 F. Supp. 3d 29 (D.D.C. 2014).  Those judgments

remain entirely unpaid.

Each group seeks to attach funds held at Wells Fargo to satisfy their judgments against

Iran.

         2.     *The Funds at Issue*

The story of how the funds at issue here arrived on the scene and came to be held at

Wells Fargo is set out most recently by the D.C. Circuit in its Opinion on an earlier motion to

quash.  <u>See</u> <u>Estate of Levin</u>, 45 F.4th at 417–19.  Plaintiffs in our four cases do not challenge this

account.

In 2019, Taif Mining Services, LLC, which purports to be an Omani company, sought to

purchase the oil tanker <u>Nautic</u> from Crystal Holdings Limited.  <u>Id.</u> at 417.  The U.S. Treasury

Department's Office of Foreign Assets Control includes Taif on its list of "Specially Designated

Nationals and Blocked Persons" because of its connection to two members of the Iranian

Revolutionary Guard.  Those individuals allegedly formed Taif as a front company designed to

appear unaffiliated with the Islamic Republic of Iran and to facilitate transactions on the state's

behalf that would otherwise be barred by U.S. sanctions.  <u>Id.</u> (citing Exec. Order No. 13,224

(2001), <u>as amended by</u> Exec. Order No. 13,886 (2019); and 31 C.F.R. § 594.201).  The Iranians

allegedly planned to use the <u>Nautic</u> "to illicitly transport oil in coordination with Iran's state-

owned oil company."  <u>Levin</u>, 523 F. Supp. 3d at 16.

Taif agreed to pay Crystal Holdings for the <u>Nautic</u> by using a British law firm, Holman

Fenwick Willan LLP (HFW), as escrow agent.  <u>Estate of Levin</u>, 45 F.4th at 417–18.  To

consummate its purchase of the tanker, Taif first initiated an electronic funds transfer (EFT) to

deposit $2.34 million with HFW as a 20% down payment in September 2019.  Id. at 418.  Those funds "reached Crystal Holdings' Swiss bank account without interruption."  Id.

In late October, Taif deposited the balance of the purchase price — $9,983,921.91 — with HFW and instructed it to initiate another EFT to Crystal Holdings in that amount.  Id.  This Court and the D.C. Circuit have previously described how EFTs navigate the international financial system through intermediary banks when the parties to the transfers hold accounts at different banks.  See id. at 418–20; Levin, 523 F Supp. 3d at 16–17; see also Heiser v. Islamic Republic of Iran, 735 F.3d 934, 936 (D.C. Cir. 2013) (describing this process generally).  Suffice it to say that this latter EFT was not successful; it was blocked midstream by OFAC at intermediary bank Wells Fargo in New York before it could be credited to Crystal Holdings' Swiss account.  Estate of Levin, 45 F.4th at 418; ECF No. 32-7 (OFAC Blocking Memoranda) (formalizing blocking of funds); see also International Emergency Economic Powers Act, 50 U.S.C. § 1702(a) (authorizing President to block certain transactions during pendency of investigation).

After the funds were blocked, Wells Fargo placed them in an account in South Dakota, as it does with all blocked assets.  Estate of Levin, 45 F.4th at 418.  Although the ship itself has long since disappeared, apparently hijacked by Iranians off the coast of the United Arab Emirates during the pendency of arbitration between Crystal and Taif Mining, id. at 424 (epilogue), the nearly $10 million sits with Wells Fargo, and those are the funds that all Plaintiffs and the United States seek in this case.

B.  Procedural Background

Efforts to recover this sum have been vigorous.

4

### 1.   *Forfeiture Action*

In May 2020, the United States filed a forfeiture action, which was assigned to this Court; its caption notwithstanding, that suit seeks to arrest both the $2.34 million down payment already in the possession of Crystal Holdings and the nearly $10 million held by Wells Fargo.  See United States v. $2,340,000.00 Associated with Petroleum Tanker *Nautic*, No. 20-1139, ECF No. 1 (Compl.) (D.D.C. May 1, 2020); 18 U.S.C. § 981(a)(1)(A), (C), (G)(i).  This Court issued a warrant for arrest *in rem* of both properties that same day.  See No. 20-1139, ECF No. 3 (Warrant) (D.D.C. May 1, 2020).  The Government subsequently applied for and received an OFAC license, which authorized it and Wells Fargo, notwithstanding the blocking orders, to "engage in all transactions necessary and ordinarily incident to [facilitate the bank's] relinquish[ing of its] custody of the Funds" conditional on the Government's obtaining a valid forfeiture order.  See ECF No. 32-9 (OFAC License Request); ECF No. 32-10 (OFAC License).

### 2.   *Owens* and *Levin* Actions

The day after the Government initiated its forfeiture action, the Wall Street Journal reported on the existence of that proceeding and the Government's indictment of the two Iranian nationals behind Taif.  See Mengqi Sun & Dylan Tokar, U.S. Charges Two Iranians over Oil Tanker Purchase, Seeking $12 Million Forfeiture, Wall St. J. (May 2, 2020), https://perma.cc/B75B-KMVT.  The report identified Wells Fargo as the custodian of the blocked assets.  Id.  Alerted to this proceeding, both the Owens and Levin Plaintiffs filed separate writs of attachment in this district to seize the nearly $10 million in blocked funds, citing the Foreign Sovereign Immunities Act and Terrorism Risk Insurance Act as the bases for their requests.  See No. 01-2244, ECF No. 450-2 (Owens Mot. for Writ of Attachment) at 4; No. 05-2494, ECF No. 34-2 (Levin Mot. for Writ of Attachment) at 2–4; Levin, 523 F. Supp. 3d at

18 (providing docket information and additional details about related actions by <u>Owens</u> and

<u>Levin</u> Plaintiffs); <u>id.</u> at 20.  Judge Bates, essentially treating the <u>Owens</u> cases as consolidated,

granted those writs shortly thereafter.  <u>See</u> No. 01-2244, ECF No. 451 (Order Granting <u>Owens</u>

Writ); No. 08-1377, ECF No. 160 (Order Granting First Consolidated Writ); No. 10-356, ECF

No. 111 (Order Granting Second Consolidated Writ).  In the <u>Levin</u> actions, Plaintiffs consented

to have their cases reassigned from Judge Randolph D. Moss to this Court, which then granted

Plaintiffs a writ of attachment without prejudice to the Government's ability to move to quash.

<u>See</u> No. 05-2494, ECF No. 41 (Dec. 26, 2020, Order on Writ).  Plaintiffs in each case then filed

motions to condemn and recover the funds, requesting orders directing Wells Fargo to deliver

them.  <u>See</u> No. 01-2244, ECF No. 464; No. 08-1377, ECF No. 167; No. 10-356, ECF No. 119.

 The Government moved to intervene in both groups of proceedings with the object of

quashing the writs in order to preserve clean title to the funds in its forfeiture action.  <u>See, e.g.</u>,

No. 01-2244, ECF No. 461 (<u>Owens</u> Mot. to Intervene); No. 05-2494, ECF No. 36 (<u>Levin</u> Mot. to

Intervene).  Then, as part of a broader effort to consolidate all funds-related litigation before one

judge, the Government moved to sever and reassign all the writs proceedings to this Court

(because it presides over the first-filed case involving the funds – <i>viz.</i>, the United States'

forfeiture action).  <u>See</u> <u>Owens v. Republic of Sudan</u>, No 01-2224, 2021 WL 131446, at *6

(D.D.C. Jan. 14, 2021).  Judge Bates granted that motion, creating three new limited-purpose

actions that were reassigned to this Court.  <u>Id.</u>  The Government then filed its first motion to

quash Plaintiffs' various writs in those proceedings.  This Court subsequently ordered that all

filings in those three actions be consolidated into the <u>Levin</u> action.  <u>See</u> ECF No. 22

(Consolidation Order).

 Not content with sticking to the east coast, the <u>Levin</u> Plaintiffs also sought and obtained

another writ of execution against the Wells Fargo funds from a federal judge in the District of South Dakota.  See Levin, 523 F. Supp. 3d at 18–19; Levin v. Islamic Republic of Iran, No. 20-mc-35, ECF No. 12 (D. S.D. Dec. 31, 2020).  That proceeding — as well as another in the Southern District of New York — is effectively stayed pending resolution of the Government's renewed Motion to Quash here.  See ECF No. 25 (Renewed Mot. to Quash) at 6 n.3.  The Government's initial forfeiture action is also now held in abeyance during the pendency of the instant proceedings to determine the validity of those writs of attachment.  See Levin, 523 F. Supp. 3d at 18.

### 3.   This Court's Prior Order and Appeal

In considering the Government's motion to quash the writs in the new consolidated action the first time around, this Court reached a single dispositive issue.  It held that the Iranian Government did not have an attachable ownership interest in the blocked funds for purposes of TRIA or the FSIA because Article 4A of the Uniform Commercial Code applied and afforded an originator (in this case, Taif Mining) no interest in funds that are blocked midstream.  Levin, 523 F. Supp. 3d at 20.  Because both TRIA and the FSIA permit attachment only of funds traceable to a foreign sovereign, Iran and Taif Mining's (as an Iranian instrumentality of sorts) lack of ownership of the funds was dispositive in determining the validity of Plaintiffs' writs.  Id.  The Court accordingly quashed the writs.

On appeal, the D.C. Circuit considered that issue alone and reversed.  It held that the Iranian Government did have an ownership interest sufficient for attachment under TRIA.  Estate of Levin, 45 F.4th at 423–24; id. at 422 (reasoning "objectives of U.C.C. § 4A-402 and OFAC's blocking are incompatible" such that former cannot be used as rule of decision for determining originator's ownership interest under TRIA).  It did not, however, rule on any of the

Government's alternative bases for quashing the writs.  Id. at 424 ("The district court's judgment rested entirely on this holding and its decision is all that we have addressed.").  The Circuit remanded and the United States now renews its Motion to Quash based on alternatives grounds. See Renewed Mot. to Quash.

## II.    Legal Standard

Although Plaintiffs have already been granted their writs of attachment against the Wells Fargo funds, it is black-letter law that this Court has "inherent power to reconsider an interlocutory order as justice requires."  Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc., 630 F.3d 217, 227 (D.C. Cir. 2011) (formatting modified); see Fed. R. Civ. P. 54(b).  District courts thus "retain broad discretion" to reconsider earlier interlocutory orders and may grant such reconsideration on a number of grounds, including the existence of new arguments or information that "might reasonably be expected to alter the conclusion reached by the court." Cobell v. Norton, 355 F. Supp. 2d 531, 539–40 (D.D.C. 2005) (formatting modified).

Here, because the Levin writ was expressly granted without prejudice to the Government's ability to later oppose it, justice requires the Court to consider the United States' arguments against the propriety of the writ's issuance.  As to the Owens Plaintiffs' writs, justice similarly requires the Court to assess the Government's arguments raised in its Motions to Quash because they were not available to Judge Bates when he granted the writs.  Courts routinely evaluate the validity of writs of attachment de novo when faced with motions to quash.  See, e.g., Bennett v. Islamic Republic of Iran, 618 F.3d 19, 21 (D.C. Cir. 2010) (affirming district court's order granting motion to quash writs of attachment, holding that "[w]hether the properties are subject to attachment is a question of law that we review de novo") (citation omitted); Stern v. Islamic Republic of Iran, 73 F. Supp. 3d 46, 48–50 (D.D.C. 2014) (granting motion to quash

writs of attachment).  The <u>Owens</u> and <u>Levin</u> Plaintiffs are generally allied against the Government in their pursuit of the funds.  Where they diverge, the Court refers to them separately.

### III.   Analysis

As in the previous iteration of this controversy, Plaintiffs ground their right to attach and execute upon the Wells Fargo funds in two different federal statutes: TRIA, Pub. L. No. 107-297, § 210(a), 116 Stat. 2322, 2337 (2002) (codified at 28 U.S.C. § 1610 note), and the FSIA, 28 U.S.C. §§ 1602 *et seq*.  The Court will address each side's arguments under these statutes separately.

A.  <u>Terrorism Risk Insurance Act</u>

Both groups of Plaintiffs rely on TRIA § 201(a) to support their writs.  That provision "subject[s] to execution or attachment" "the blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)" against which a plaintiff holds a terrorism-related judgment under 28 U.S.C. § 1605A.  <u>See</u> TRIA § 201(a).  Section 201(a) also specifies that such assets can be attached "[n]otwithstanding any other provision of law."  <u>Id.</u>  Plaintiffs and the Government disagree, however, about whether the funds at issue here were "blocked assets" at the time their writs were issued and, regardless, whether the prior-exclusive-jurisdiction doctrine deprived the district court of jurisdiction to issue the writs in the first place despite TRIA's "notwithstanding" provision.  The Court will examine each issue in turn.

*1.    Blocked Assets*

To begin, are the funds currently held at Wells Fargo "blocked assets" for purposes of TRIA?  Recall that TRIA's attachment provisions apply only to "blocked assets," TRIA

§ 201(a), which the statute defines as "any asset seized or frozen by the United States under . . . sections 202 and 203 of the [IEEPA]." Id. § 201(d)(2)(A).  Here, the funds at issue were "frozen" under IEEPA rather than "seized."  See OFAC Blocking Memoranda; 50 U.S.C. § 1702(a)(1)(C) (allowing for "confiscation" of property only "when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals"). The Government contends that the funds here are no longer "frozen" because they are now subject to an OFAC license that enables the United States "to engage in all transactions necessary and ordinarily incident to effect the forfeiture of" the funds.  See Renewed Mot. to Quash at 25–28.  This is correct.

The Second, Fifth, and Seventh Circuits, as well as judges in this district, have unanimously held that when an otherwise "blocked" transaction becomes subject to an OFAC license, the relevant assets become unblocked and "not subject to attachment" under TRIA. Bank of N.Y. v. Rubin, 484 F.3d 149, 150 (2d Cir. 2007); see also United States v. Holy Land Found. Relief & Dev., 722 F.3d 677, 687 (5th Cir. 2013) (holding that "TRIA could not be applied to . . . funds [subject to an OFAC license] since they no longer qualif[y] as blocked under that statute"); United States v. All Funds on Deposit with R.J. O'Brien & Assocs., 783 F.3d 607, 622–25 (7th Cir. 2015) ("The [OFAC] license, coupled with the restrained status of the funds, rendered them unblocked under TRIA."); Mwani v. Al Qaeda, No. 99-125, 2021 WL 5800737, at *14 (D.D.C. Dec. 7, 2021) ("[T]o be reachable by a victim of a terrorist attack, the frozen assets must not have been unblocked by the issuance of a license."); Wyatt v. Syrian Arab Republic, 83 F. Supp. 3d 192, 197 (D.D.C. 2015) ("Because the funds are subject to an OFAC license[,] . . . they are no longer 'frozen or seized' as required by the statute."); Estate of Heiser v. Islamic Republic of Iran, 807 F. Supp. 2d 9, 18 n.6 (D.D.C. 2011).  This Court agrees with

their analyses.

Just like the assets that were the subject of those cases, the nearly $10 million currently held by Wells Fargo is no longer "blocked" for the purposes of TRIA. OFAC initially blocked those funds pursuant to IEEPA. See OFAC Blocking Memoranda (citing IEEPA). The United States then requested an OFAC license "for the purpose of perfecting civil *in rem* forfeiture of the" funds. See ECF No. 32-9 (Request for OFAC License) at 1. OFAC granted that request and issued a license (also under the authority of IEEPA) unblocking the funds to allow the United States and Wells Fargo "to engage in all transactions necessary and ordinarily incident to effect the forfeiture of" those funds. See OFAC License at 1–2 (citing IEEPA, 50 U.S.C. § 1701–06; and 31 C.F.R. pt. 501 as authority for unblocking funds); R.J. O'Brien, 783 F.3d at 625 (noting that funds at issue there were subject to "OFAC . . . license to the United States 'to pursue criminal forfeiture of the . . . assets'") (quoting Holy Land Found. Relief & Dev., 722 F.3d at 687). Since the Wells Fargo funds are no longer "frozen . . . under [IEEPA]," TRIA § 201(d)(2)(A), Plaintiffs cannot invoke TRIA to attach and execute upon them.

Against the weight of this precedent, Plaintiffs advance several counterarguments. First, the Owens Plaintiffs maintain that they obtained their writs before the United States received its OFAC license to pursue forfeiture of the funds and that, therefore, the funds were frozen at the time of their writs. See ECF No. 29 (Owens Opp.) at 14–16. The Seventh Circuit, however, considered and persuasively rejected a similar argument in R.J. O'Brien. There, the Government produced its OFAC license for the first time on appeal, and Plaintiffs maintained that the Government had waived its argument that the assets were not blocked or, alternatively, that the district court's treatment of the funds as blocked should be dispositive. See R.J. O'Brien, ECF No. 30 (Appellees' Br.) at 47–55. The Court of Appeals held otherwise, noting that just because

the funds were "at one point or another . . . found . . . to be blocked does not render them blocked now." R.J. O'Brien, 783 F.3d at 623.  It continued: "TRIA, moreover, 'does not guarantee that any blocked assets will in fact be available when a particular victim seeks to execute on a judgment.'" Id. (quoting Smith v. Fed. Reserve Bank of N.Y., 346 F.3d 264, 271 (2d Cir. 2003)).  As a result, even if the Owens Plaintiffs are correct and the funds were available for attachment under TRIA at the time their writs were issued, the Court agrees with the Seventh Circuit that they are not available for execution now.

Both the Owens and Levin Plaintiffs also argue that the Government's OFAC license is insufficient to unfreeze these assets under TRIA for various other reasons, but none is availing. See Owens Opp. at 15–17; ECF No. 28 (Levin Opp.) at 13–14.  The Owens Plaintiffs, for example, point to another provision of TRIA, § 201(d)(2)(B), which creates a carve-out from the definition of a "blocked asset" for "property that . . . is subject to a license issued . . . [under a] statute other than the [IEEPA]."  From that provision, the Owens Plaintiffs surmise, the only way to unblock an asset that was initially blocked under IEEPA would be to obtain a license under a statute other than IEEPA.  Owens Opp. at 16.  On this theory, the OFAC license here, which (like the initial blocking order) was issued pursuant to IEEPA, would not qualify to unblock the assets.  That provision, however, is best understood to mean that for an asset to be "blocked" under TRIA, it must (a) be frozen or seized under IEEPA, and (b) not subject to a license for disposition under another statutory regime.  See, e.g., Rubin, 484 F.3d at 150 ("[W]e hold that assets blocked pursuant to" IEEPA authorities "that are also subject to the general license . . . are not blocked assets under the TRIA and therefore are not subject to attachment under that statute."); see also Reply at 6 (explaining that "Congress sought to avoid technicalities with overlapping blocking regimes" by allowing for non-IEEPA licenses to also unblock assets under

TRIA).  Here, we need not inquire into the latter question of whether OFAC issued a license

subject to another, non-IEEPA statutory regime because OFAC's license issued under its IEEPA

authority means that the assets are no longer frozen under IEEPA to begin with.

The Court therefore concludes that the Wells Fargo funds are not "blocked assets" for

purposes of TRIA and are thus unavailable for attachment thereunder.

### 2.     *"Notwithstanding" Provision*

Even were the Court to assume that the funds are "blocked" for purposes of TRIA, it

would still rule in favor of the Government.  This is because Plaintiffs are wrong that § 201(a) of

TRIA, which requires its application "[n]otwithstanding any other provision of law," trumps the

prior-exclusive-jurisdiction doctrine.  That doctrine recognizes that "when one court is exercising

*in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same

*res*."  Marshall v. Marshall, 547 U.S. 293, 311 (2006); see also Princess Lida of Thurn & Taxis

v. Thompson, 305 U.S. 456, 466–67 (1939); Wright & Miller, 13F Fed. Prac. & Proc. Juris.

§ 3631 (3d ed., Oct. 2020) ("[W]hen a state or federal court of competent jurisdiction has

obtained possession, custody, or control of particular property, that authority and power over the

property may not be disturbed by any other court.") (collecting citations).  The Court will begin

with TRIA and then move to that doctrine's application.

### a.   Scope of "Notwithstanding" Clause

TRIA § 201(a) provides that "[n]otwithstanding any other provision of law[,] . . . in every

case in which a person has obtained a judgment against a terrorist party on a claim based upon an

act of terrorism[,] . . . the blocked assets of that terrorist party . . . shall be subject to execution or

attachment."  (Emphasis added).  The parties disagree on the scope of the underlined clause.  On

Plaintiffs' reading, it should be interpreted broadly to encompass both conflicting statutory law

and common-law presumptions.  See Levin Opp. at 14–29; Owens Opp. at 10–13.  This would

mean that TRIA would overcome the prior-exclusive-jurisdiction doctrine and allow for

attachment of the Wells Fargo funds.  The Government, however, reads the clause more

narrowly, locating "TRIA in a place of precedence vis-à-vis conflicting [statutory provisions],

not common law jurisdiction[al] precepts" such as the prior-exclusive-jurisdiction doctrine.  See

Renewed Mot. to Quash at 20.

　　　After briefing on this Motion concluded, the D.C. Circuit released an opinion in

Greenbaum v. Islamic Republic of Iran, No. 22-5080, 2023 WL 3312348 (D.C. Cir. May 9,

2023), considering a closely related question.  That case had to do with whether TRIA's

notwithstanding clause effected a waiver of the United States' sovereign immunity from creditor

process.  Judge Royce Lamberth of this district had held that this provision of TRIA did not

constitute a waiver of the Government's sovereign immunity because he had interpreted TRIA

§ 201(a) as "refer[ring] only to other statutes, and not . . . common law doctrine[s]."  Greenbaum

v. Islamic Republic of Iran, 588 F. Supp. 3d  77, 82 (D.D.C. 2022) (internal citation omitted).

On appeal, the Circuit did not go that far.  It began by emphasizing that the phrase "'other

provision of law' is at best ambiguous."  Greenbaum, 2023 WL 3312348, at *3.  Rather than

parse the scope of that provision and its applicability to common-law doctrines generally, the

Circuit held merely that "[f]ederal sovereign immunity is no ordinary rule of common law" and

thus requires clear waiver, which TRIA does not provide.  Id. at *4 (internal quotation marks

omitted).  Ultimately, the Circuit reserved for another day the question "whether the

notwithstanding clause in the TRIA . . . is best read in some cases as an instruction to set aside

conflicting common law doctrines."  Id. (internal quotation marks omitted).

　　　Despite the Circuit's hesitancy, this Court believes that the best reading of TRIA's text is

the one the Government proposes and that Judge Lamberth adopted.  As the Circuit itself

recognized, Black's Law Dictionary and others regularly define the term "provision" to refer to a

"clause in a statute, contract, or other legal instrument."  Id. at *3.  (citing Provision, Black's

Law Dictionary (8th ed. 2004)); see also id. (citing Merriam Webster's Dictionary of Law 394

(1996) (defining "provision" as "a stipulation (as a clause in a statute or contract) made

beforehand"); and American Heritage Dictionary of the English Language 666 (3rd ed. 1994)

("A stipulation or qualification, esp., a clause in a document")).  Common-law doctrines are "not

such an 'instrument,' which Black's further defines as a 'written legal document that defines

rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or

share certificate."  Greenbaum, 2023 WL 3312348, at *3.

      Additionally, a reading of TRIA's notwithstanding provision that Plaintiffs would have

this Court adopt — one that is broad enough to capture common-law jurisdictional doctrines in

addition to conflicting statutory provisions but simultaneously narrow enough not to encompass

a waiver of sovereign immunity — would thread a very narrow needle.  Cf. Mobilfone Serv.,

Inc. v. Fed. Commc'n Comm'n, 79 F. App'x 445, 446–47 (D.C. Cir. 2003) (holding

"notwithstanding" clause did "not authorize a litigant to initiate a judicial proceeding where one

does not otherwise exist" and rejecting argument that clause superseded otherwise applicable

"jurisdictional prerequisites").  Such a reading would run afoul of the principle that statutes

should not be read to displace the common law unless they do so clearly, cf. Antonin Scalia &

Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 52 (1st ed. 2012) ("A statute

will be construed to alter the common law only when that disposition is clear."), and would also

likely contradict Congress's own drafting practices.  See Greenbaum, 2023 WL 3312348, at *3

(discussing Immigration and Naturalization Act, whose "notwithstanding" provision explicitly

references nonstatutory law) (citing 8 U.S.C. § 1252(a)(2)(A), (a)(2)(B), (a)(2)(C), (a)(4), (a)(5)).

At the very least, the Circuit's logic applies to common-law jurisdictional limitations like this one which, much like sovereign immunity, are no ordinary discretionary or prudential rules but instead establish a "mandatory jurisdictional limitation."  Chapman v. Deutsche Bank Nat'l Trust Co., 651 F.3d 1039, 1043 (9th Cir. 2011) (internal quotation marks omitted).  Furthermore, allowing TRIA to overcome the prior-exclusive-jurisdiction doctrine in particular would undoubtedly lead to numerous and conflicting proceedings as creditors rush to the courts to vindicate their competing claims, as this case exemplifies.  See ECF No. 23 (Wells Fargo Response) at 2–3 (expressing support for rule of decision that "minimize[s] the risk that garnishee banks find themselves subject to multiple litigation, contradictory obligations, or double liability"); Renewed Mot. to Quash at 24 ("[I]f the statute renders dead letter the prior exclusive jurisdiction doctrine for TRIA creditors, it would permit any TRIA creditor to institute their own attachment and turnover proceedings . . . ."); see also Estate of Levin, 45 F.4th at 426 (Pillard, J., concurring) (warning that courts must consider ways to "reduce legal uncertainty for innocent owners and third parties" when adjudicating competing claims to blocked assets).  This Court refuses to adopt such an expansive interpretation of TRIA.

### b.  Prior-Exclusive-Jurisdiction Doctrine

Finding that TRIA's "notwithstanding" provision does not overcome conflicting jurisdictional common-law doctrines, the Court turns now to the effect of the prior-exclusive-jurisdiction doctrine on the parties' competing claims.  That doctrine, the reader will recall, precludes a court from exercising jurisdiction over a res when a separate suit over that property has already been brought.  "Although the doctrine is based at least in part on considerations of comity and prudential policies of avoiding piecemeal litigation, it is no mere discretionary

abstention rule.  Rather, it is a mandatory jurisdictional limitation." Chapman, 651 F.3d at 1043 (internal quotation marks omitted); cf. Kline v. Burke Constr. Co., 260 U.S. 226, 229 (1922) (explaining similar rule with regard to state-court jurisdiction).

Here, the implications of the doctrine on the parties' competing claims are clear.  Because the Government's civil-forfeiture action obtained *in rem* jurisdiction over the assets first, that proceeding acquired exclusive jurisdiction over them.  Plaintiffs must seek relief there — *e.g.*, via intervention — as opposed to in a separate proceeding.  See Fed. R. Civ. P. G(5)(a)(i) ("A person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending.").

To avoid that conclusion, the Owens Plaintiffs propose a novel limitation: the doctrine is inapplicable in a case such as this one "where two suits over the same property are brought in the same forum." Owens Opp. at 22; see also id. at 20.  The upshot of this argument for them is that this carve-out would disfavor the Levin Plaintiffs' writs, which were issued in South Dakota and New York, while still allowing the Owens Plaintiffs (as well as the other claimants in this district) to vindicate their claim to the funds.  Id. at 24.

That distinction, however, would distort the doctrine's intended purpose of achieving comity and avoiding piecemeal litigation.  It also misunderstands the jurisdictional reach of each individual *in rem* suit brought against the disputed property.  It is the first-filed suit that takes precedence, regardless of whether other actions concerning the property are filed in that district or even before the same judge.  See United States v. Bank of N.Y. & Tr. Co., 296 U.S. 463, 477 (1936) ("If the two suits are *in rem* or *quasi in rem*, so that the court must have possession or control of the *res* in order to proceed with the cause and to grant the relief sought, the jurisdiction of one court must of necessity yield to that of the other.") (emphasis added and formatting

altered); Hammer v. Dep't of Health & Hum. Servs., 905 F.3d 517, 536 (7th Cir. 2018) ("[T]wo

suits, both of which are *in rem* or *quasi in rem* and require the courts to have possession or

control of the same property, cannot proceed at the same time, and the second court must yield to

the first.").  Once such a suit is filed, the property comes within the jurisdiction of that particular

proceeding, not the specific judge or court overseeing it.  That principle makes sense since "[a]

decision of a federal district court judge is not binding precedent in either a different judicial

district, the same judicial district, or even upon the same judge in a different case."  Camreta v.

Greene, 563 U.S. 692, 709 n.7 (2011) (quoting 18 J. Moore et al., Moore's Federal Practice

§ 134.02[1] [d], p. 134–26 (3d ed. 2011)) (emphasis added).  Given that basic axiom of

precedent and jurisdiction in the federal district courts, the Owens Plaintiffs' exception to the

prior-exclusive-jurisdiction rule would enable different judges in the same courthouse — or even

the same judge in different cases — to subject the same *res* to competing rulings depending on

the proceeding.  This Court declines to endorse such an exception and holds that the

Government's civil-forfeiture proceeding and the prior-exclusive-jurisdiction doctrine bar

Plaintiffs from attaching the Wells Fargo funds under TRIA in collateral proceedings.

    B.  Foreign Sovereign Immunities Act

Plaintiffs alternatively ground their right to attach the Wells Fargo funds on the FSIA,

which provides that foreign properties may be subject to attachment in certain circumstances,

including when such property is being "used for a commercial activity in the United States."

Owens Opp. at 28; Levin Opp. at 1 n.2.  In addition to the prior-exclusive-jurisdiction doctrine,

which applies with equal force to Plaintiffs' FSIA claims, two additional arguments support a

finding that this statute similarly cannot provide a basis for their writs.  First, the separate civil-

forfeiture statute prohibits courts in other proceedings from issuing orders or writs directed to

property that has become the subject of a civil-forfeiture action.  (Its operation here is admittedly quite similar to that of the prior-exclusive-jurisdiction doctrine.)  Second, the assets in question (by virtue of being blocked) are not property "used for commercial activity in the United States" as required by the FSIA.  The Court will address each argument in turn.

### 1.    *Effect of Civil-Forfeiture Statute*

Begin with the preclusive effect of the civil-forfeiture statute.  That statute generally prevents creditors from attempting to obtain orders in other proceedings regarding property already subject to a civil-forfeiture action.  Title 18 U.S.C. § 981(c) provides that once property has been brought into the *in rem* jurisdiction of a civil-forfeiture proceeding, it "shall not be repleviable," is "deemed to be in the custody of the Attorney General," and is "subject only to the orders and decrees of the court or the official having jurisdiction thereof."  Because the FSIA, unlike TRIA, has no "notwithstanding" clause, this conflicting statutory provision would preclude Plaintiffs from relying on the FSIA to attach the Wells Fargo funds.

Courts in this district and others have regularly dismissed complaints "for lack of subject matter jurisdiction once [the United States] initiate[s] forfeiture proceedings."  Lasry v. Mayorkas, No. 22-756, 2022 WL 3908071, at *2 (D.N.J. Aug. 30, 2022) (collecting cases); see, e.g., id. ("Districts across the nation . . . have established that a civil forfeiture action provides an exclusive forum to resolve disputes over seized property."); Wada v. U.S. Secret Serv., 525 F. Supp. 2d 1, 11 (D.D.C. 2007) (holding that "once the United States District Court for the Eastern District of Michigan issued . . . warrant to seize . . . funds from . . . account, it acquired exclusive jurisdiction over those funds").  This is so even when the other proceedings are filed in the same forum, or even before the same judge, as the original forfeiture proceeding.  See, e.g., McRaith v. Leading Edge Grp. Holdings, Inc., No. 10-3351, 2010 WL 4446852, at *1 (D.N.J. Nov. 1, 2010)

(dismissing declaratory-judgment suit seeking to establish priority over certain funds, which funds were subject to separate civil-forfeiture action before same judge); We CBD, LLC v. United States, No. 21-115, 2022 WL 989253, at *9 (W.D.N.C. Mar. 31, 2022) ("It is well settled that a forfeiture 'action _in rem_ is not subject to collateral attack in any other court.'") (formatting altered and citation omitted); Yellen v. Illinois, No. 00-3342, 2000 WL 1016940, at *2 (N.D. Ill. July 20, 2000).

Here, OFAC initially blocked the funds pending an investigation on November 20, 2019, instructing Wells Fargo to block and not otherwise transfer the funds "unless otherwise authorized by OFAC."  ECF No. 32-7 (OFAC Block Pending Investigation Memo.) at 1.  That action brought the funds within the control of the United States.  Zarmach Oil Servs., Inc. v. Dep't of Treasury, 750 F. Supp. 2d 150, 157 (D.D.C. 2010) ("Once blocked, the assets cannot be transferred except pursuant to an OFAC license.").  Thereafter, the Government filed its civil-forfeiture action on May 1, 2020, and this Court issued a warrant for arrest _in rem_.  See Warrant. At that point, the forfeiture action became the exclusive forum to resolve disputes over those funds, and Plaintiffs should have sought relief there.  See McRaith, 2010 WL 4446852, at *3 ("The civil forfeiture action provides an appropriate, and indeed exclusive, forum to resolve disputes over the funds and to adjudicate all claims to the funds seized[.]").

The Owens Plaintiffs, however, raise a new collateral challenge to the Government's forfeiture action.  They contend that the United States did not properly execute the warrant issued in that action; as a result, the court in that proceeding does not have proper jurisdiction over the funds.  See Owens Opp. at 25–28.  At the outset, the Court notes that the appropriate forum to have raised such an objection would have been the civil-forfeiture proceeding itself. See 18 U.S.C. § 981(c) (noting that property subject to forfeiture proceeding is "subject only to

the orders and decrees of the court or the official having jurisdiction thereof"); see also United States v. Vazquez-Alvarez, 760 F.3d 193, 197 (2d Cir. 2014) (holding that before a party can challenge execution of warrant in forfeiture proceeding, it must establish standing in forfeiture action itself).

In any event, contrary to Plaintiffs' contention, the United States' proper execution of the warrant — while ordinarily a jurisdictional prerequisite — was not necessary in this case.  At the time the Government initiated its forfeiture action, the Wells Fargo funds were within the exclusive control of the United States pursuant to an OFAC blocking order.  As a result, under the Federal Rules of Civil Procedure, the Government did not need to do anything more to bring the funds into the jurisdiction of that proceeding.  See Fed. R. Civ. P. Supp. R. G(3)(c)(ii)(A) ("The authorized person or organization must execute the warrant and any supplemental process on property in the United States as soon as practicable unless: (A) the property is in the government's possession, custody, or control[.]") (emphasis added); Vazquez-Alvarez, 760 F.3d at 197 ("[E]xecution of the arrest warrant is specifically excused by the Forfeiture Rules when the property is already in the government's possessions, custody or control."); United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd., 324 F. Supp. 3d 38, 46 n.7 (D.D.C. 2018) (holding "control" provisions of Supplemental Rule G(3)(b)(i) and G(3)(c)(ii)(A) applied when funds were subject to OFAC blocking order).

The FSIA, therefore, offers no avenue for the Owens or Levin Plaintiffs to attach the funds.

### 2.    FSIA's Commercial-Activity Requirement

Even if the civil-forfeiture statute does not govern here, there are other reasons why Plaintiffs cannot rely on the FSIA to attach the funds at issue.  Congress enacted the FSIA "in an

effort to codify [a] careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions." Rubin v. Islamic Republic of Iran, 138 S. Ct. 816, 822 (2018).  With respect to the property of a foreign sovereign, FSIA § 1609 provides as a default that "the property in the United States of a foreign state shall be immune from attachment arrest and execution."  Section 1610 then lists exceptions to this default presumption, outlining circumstances under which property will not be immune.  As relevant here, § 1610(a)(7) provides that property "shall not be immune" from attachment or execution where it is "used for a commercial activity in the United States" and the "judgement relates to a claim for which the foreign state is not immune under section 1605A . . . ."  Similarly, § 1610(f)(1)(A) offers another exception, providing that "any property with respect to which financial transactions are prohibited or regulated" by, *inter alia*, IEEPA are "subject to execution or attachment" by creditors with terrorism-related judgments against a foreign state under the same section 1605A.

The parties here dispute which exception — 1610(a)(7) or 1610(f)(1)(A) — governs Plaintiffs' efforts to attach the Wells Fargo funds.  The Government urges that § 1610(f)(1)(A) is the appropriate and exclusive FSIA provision for attaching the funds at issue.  See Reply at 22. Plaintiffs disagree and contend that they can elect to proceed under the more general attachment provision, § 1610(a)(7).  See Owens Opp. at 36.  Ultimately, the Court need not decide whether Plaintiffs may elect to pursue attachment under both provisions because the Court finds that they fail to meet the "commercial activity" requirement under their chosen route, § 1610(a)(7).

To successfully invoke § 1610(a), a creditor must show that: (1) the property he seeks to collect is "property in the United States of a foreign state," (2) that property is "used for a commercial activity in the United States," and (3) his judgment "fit[s] . . . into one of seven

enumerated exceptions" outlined in subparagraphs to § 1610(a), which, as relevant here, includes the exception for terrorism-related judgments against a foreign state. TIG Ins. Co. v. Republic of Argentina, 967 F.3d 778, 782 (D.C. Cir. 2020) (describing 28 U.S.C. § 1610(a)); 28 U.S.C. § 1610(a)(7)). Even if the Owens Plaintiffs satisfy the first and third, they stumble over the second — i.e., commercial activity.

The FSIA defines "commercial activity" to include "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). In determining whether a foreign sovereign's property is "used for commercial activity in the United States," the D.C. Circuit has instructed that a court must consider the property's use at the time of the filing of the lawsuit and do so under the totality of the circumstances. TIG Ins. Co., 967 F.3d at 782, 785 (directing courts to examine "all uses of the [p]roperty, including recent past uses, as well as whether the foreign state has manipulated the [p]roperty's use or status to evade attachment and execution, and whether the [p]roperty remains available for commercial use") (internal quotation marks omitted); see also 28 U.S.C. § 1603(d) ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.").

At the time that Plaintiffs filed their initial suits attempting to attach the funds, they had no commercial purpose. Plaintiffs sought their writs in May 2020, and by that time the funds had lain dormant for many months. Cf. Weininger v. Castro, 462 F. Supp. 2d 457, 482 (S.D.N.Y. 2006) (allowing execution of blocked funds held by U.S. bank belonging to Cuba under TRIA rather than the FSIA "presumably because there is insufficient evidence that the property at issue . . . is property used for commercial activity [when] it consists of blocked assets"). Indeed, any commercial activity intended for the funds was "thwarted at the threshold,"

Renewed Mot. to Quash at 16 n.6, because OFAC "blocked [the funds] in the instant after Wells

Fargo debited" the originating escrow account.  Estate of Levin, 45 F.4th at 418.  Even now that

the funds have been unblocked to effectuate the United States' civil-forfeiture proceeding, see

supra § III.A.1., they maintain only a "sovereign [rather] than commercial" use.  See Flatow, 76

F. Supp. 2d at 24.  These funds consequently do not meet the threshold requirement in § 1610(a)

of commercial activity and are unavailable for attachment under the FSIA.

*     *     *

Beyond the legal obstacles that prevent Plaintiffs from executing their writs here,

allowing their actions to go forward would fundamentally undermine Congress's intended

scheme for compensating victims of state-sponsored terrorism.  Congress has continually favored

an orderly and equitable process for compensating all U.S. claimants holding judgments against

state sponsors of terrorism, like Iran.  Over time, Congress has modified and refashioned its

approach to affording these victims pathways to collect on their judgments, see In re Islamic

Republic of Iran Terrorism Litigation, 659 F. Supp. 2d 31, 55–58 (D.D.C. 2009), and it has been

particularly responsive to concerns about inequities in payments from the various funds,

including the USVSST, to the many claimants with outstanding judgments.  See O'Neil v.

Garland, No. 21-1288, 2022 WL 17415057, at *7 (D.D.C. Dec. 5, 2022).  The statutory backdrop

for the USVSST, TRIA, and the FSIA, and the subsequent amendments that have been enacted

over the years cast heavy doubt that it was Congress's intent to encourage a race to the

courthouse by individual victims seeking to attach foreign funds that glance off the U.S. financial

system.

## IV.    Conclusion

For the foregoing reasons, the Court will grant the Government's Motion to Quash the

writs of attachment in these consolidated cases.  A contemporaneous Order so stating shall issue

this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  June 1, 2023